SEAN REIS (SBN 184004)
sreis@edelson.com
EDELSON MCGUIRE, LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

JAY EDELSON (*Pro Hac Vice*)
jedelson@edelson.com
RYAN D. ANDREWS (*Pro Hac Vice*)
randrews@edelson.com
CHRISTOPHER L. DORE (*Pro Hac Vice*)
cdore@edelson.com
EDELSON MCGUIRE, LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

ATTORNEYS FOR PLAINTIFF
AND THE CLASSES

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| CHRISTOPHER KRAMER, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AUTOBYTEL, INC., a Delaware corporation, and B2MOBILE, LLC, a California limited liability company, and LEADCLICK MEDIA, INC., a California corporation, <br><br> Defendants. | No. 10-cv-02722-CW <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT** <br><br> Location: Courtroom 2, 4th Floor <br> 1301 Clay Street <br> Oakland, CA 94612-5212 <br> Date: January 26, 2012 <br> Time: 2:00 p.m. <br><br> Honorable Claudia A. Wilken |

## NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that the Plaintiff will move the Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant final approval of the settlement in this class action on January 26, 2012 at 2:00 p.m., or at such other time as may be set by the Court, at 1301 Clay Street, Oakland, CA 94612, Courtroom 2, Fourth Floor, before the Honorable Claudia A. Wilken.

Plaintiff, as representative of the B2Mobile Class and LeadClick Auto Class,[1] seeks final approval of the class action settlement reached in this action as fair, reasonable, and adequate. The Motion is based on this Notice of Motion, the authorities cited in the attached Memorandum in Support, Plaintiff's Combined Opposition and Motion to Strike Objections of Steven Cope and Snider-Cannata Interests LLC, oral argument of counsel, and any other matter that may be submitted at the hearing.

Dated: January 12, 2012                    Respectfully Submitted,

                                           CHRISTOPHER KRAMER, individually and on
                                           behalf of classes of similarly situated individuals,


                                             /s/ Ryan D. Andrews


                                           JAY EDELSON (*Pro Hac Vice*)
                                           jedelson@edelson.com
                                           RYAN D. ANDREWS (*Pro Hac Vice*)
                                           randrews@edelson.com
                                           CHRISTOPHER L. DORE (*Pro Hac Vice*)
                                           cdore@edelson.com
                                           EDELSON MCGUIRE, LLC
                                           350 North LaSalle, Suite 1300
                                           Chicago, IL 60654
                                           Telephone: (312) 589-6370
                                           Facsimile: (312) 589-6378

---

[1] Capitalized terms not otherwise defined herein are as defined in the Settlement Agreement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    HISTORY OF THE LITIGATION .................................................................. 3

III.   KEY TERMS OF THE SETTLEMENT ......................................................... 5

    A.    Class Definition ...................................................................................... 5

    B.    Cash Payment to Class Members ............................................................ 6

    C.    Injunctive Relief .................................................................................... 6

         1.    Obtaining Prior Express Consent ................................................ 7

         2.    Proof of Consent ......................................................................... 7

         3.    Modification of Third-Party Agreements ..................................... 7

         4.    Prohibition on Future Messages .................................................. 7

    D.    *Cy Pres* ................................................................................................ 7

    E.    Payment of Notice and Administrative Expenses ................................... 8

    F.    Compensation for the Class Representative ........................................... 8

    G.    Payment of Attorneys' Fees and Expenses ............................................ 8

    H.    Release of Claims .................................................................................. 8

IV.   THE CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23 ........... 9

V.    THE SETTLEMENT WARRANTS FINAL APPROVAL ................................ 12

    A.    The Strength of the Plaintiff's Case .................................................... 13

    B.    The Risk of Continued Litigation ........................................................ 15

    C.    The Risk of Maintaining Class Action Status ...................................... 16

    D.    The Amount Offered in the Settlement is Substantial ........................... 16

    E.    The Extent of Discovery Completed and the Stage of the Litigation ............ 17

    F.    The Experience and Opinion of Counsel .............................................. 18

    G.    The Presence of a Governmental Participant ........................................ 19

    H.    The Reaction of Class Members .......................................................... 19

    I.    Given the Absence of Any Signs of Collusion, the Settlement Does Not Require Additional Scrutiny ....................................................... 20

    J.    Similar Settlements Have Received Final Approval .............................. 22

VI.   CONCLUSION ............................................................................................ 23

**TABLE OF AUTHORITIES**

**U.S. Supreme Court Cases**

*Byrd v. Civil Serv. Comm'n*, 459 U.S. 1217 (1983) ...................................................................... 12

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............................................ 9

*Protective Comm. For Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968) .......................... 13

**U.S. Appellate Court Cases**

*Churchill Village, LLC v. Gen Elec.*, 361 F.3d 566 (9th Cir. 2004) ................................... 9, 12, 19

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ............................................ 12

*Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) ................................................. 13

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1988) ....................................................... 12

*In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................ 20, 21, 22

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) .......................................... 15, 17

*In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ................................................... 18

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ....................................................................... 13

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) .................................. 16

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) .................................... *passim*

*Satterfield v. Simon & Schuster*, 569 F.3d 946 (9th Cir. 2009) ................................................. 14

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994) ......................................................................... 9

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ............................................................ 21, 22

**U.S. District Court Cases**

*Abbas v Selling Source, LLC*, No. 09 CV 3413, 2009 WL 4884471
(N.D. Ill. Dec. 14, 2009) .................................................................................................... 14

*Bellows v. NCO Fin. Sys., Inc.*, 3:07-CV-01413-W-AJB, 2008 WL 5458986
(S.D. Cal. Dec. 10, 2008) .................................................................................................. 23

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ....................................................... 18

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV-08-1365-CW, 2010 WL 1687832
(N.D. Cal. Apr. 22, 2010) ............................................................................................ *passim*

*Gutierrez v. Barclays Group*, No. 10-cv-1012 DMS (BGS), 2011 WL 579238
(S.D. Cal. Feb. 9, 2011) ..................................................................................................... 14

*In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX, 2011 WL 3861703
(C.D. Cal. Aug. 31, 2011) ................................................................................. 20

*In re OmniVision Tech. Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................... 12, 15

*In re Oracle Securities Litigation*, 131 F.R.D. 688 (N.D. Cal. 1990) ................................... 22

*Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642 (W.D. Wash. 2007) ..................................... 14

*Kazemi v. Payless Shoesource, Inc.*, No. C 09-5142 MHP, 2010 WL 963225
(N.D. Cal. Mar. 16, 2010) ................................................................................. 14

*Kent v. Hewlett-Packard Co.*, No. 5:09-CV-05341-JF HRL, 2011 WL 4403717
(N.D. Cal. Sept. 20, 2011) ................................................................................. 19

*Lewis v. Starbucks Corp.*, No. 07-cv-00490, 2008 WL 4196690
(E.D. Cal. Sept. 11, 2008) ................................................................................. 13

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ................................... 15, 17

*Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999 (N.D. Ill. 2010) ........... 14, 23

*Nat'l Rural Telecomms. Corp. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ........... 17, 19

*Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No. 08 C 5959, 2010 WL 4931001
(N.D. Ill. Nov. 29, 2010) ................................................................................. 14

*Weinstein v. The Timberland Co. et al*, No. 1:06-cv-00484 (N.D. Ill. Dec. 18, 2008) ................ 23

**State Cases**

*Critchfield Physical Therapy v. Taranto Group, Inc.*, 263 P.3d 767 (Kan. 2011) ..................... 14

**Statutes**

28 U.S.C. § 1715(b) ................................................................................................ 11, 19

47 U.S.C. § 227. ................................................................................................ 1, 14, 17

**Rules**

Fed. R. Civ. P. 23 ................................................................................................ *passim*

**Other Authority**

*Alba Conte & Herbert B. Newberg*, NEWBERG ON CLASS ACTIONS § 11:41 (4th Ed 2002) ........ 13

Amanda Lenhart, *Cell Phones and American Adults: They Make Just as Many Calls,
but Text Less than Teens*, Pew Research Center (2010) .................................... 1

Kathryn Zickuhr, *Generations and Their Gadgets*, Pew Research Center's Internet
and American Life Project (Feb. 3, 2011) ................................................................ 1

MANUAL FOR COMPLEX LITIG. (FOURTH) § 21.61 (2004) ................................... 12

1  I.      INTRODUCTION

2          Eighty-five percent of American adults now own a cellular telephone.[2]  Unlike traditional

3  "landline" phones, cell phones allow consumers to not just make "voice" calls, but to

4  communicate via text message.[3]  This text messaging functionality, coupled with the ubiquity of

5  cell phones in the United States, has attracted scores of advertisers seeking to market their wares

6  directly to consumers at a very low cost.  Unfortunately for consumers, text message advertising

7  has given rise to text message spam.  In fact, a recent Pew Research Center Report found that 57%

8  of adults with cell phones have received unwanted, or "spam" text messages on their phone.[4]  This

9  action arises out of the emerging text message advertising landscape.

10         On April 1, 2009, Class Representative Christopher Kramer began receiving text message

11 advertisements on his cell phone to which he did not consent.  (*See* Docket Numbers ("Dkt. Nos.")

12 1 & 20.)  Shortly thereafter, Kramer initiated this class action alleging that text message

13 advertisements were sent to millions of consumers nationwide by or on behalf of Defendants

14 B2Mobile, LLC and LeadClick Media, Inc. in violation of the Telephone Consumer Protection

15 Act ("TCPA"), 47 U.S.C. § 227 *et seq.*  (*Id.*)  In response, both Defendants moved to dismiss.

16 (Dkt. Nos. 25, 36, 37, 58 & 66.)  The United States intervened to oppose Defendants'

17 constitutional challenges and, after lengthy briefing, the Court denied the Defendants' Motions to

18 Dismiss.  The Parties then commenced discovery, but also agreed to attempt to resolve this dispute

19 through mediation with Professor Eric D. Green of Resolutions, LLC.  (*See* Dkt. Nos. 98, 105-08.)

20 The Settlement borne from the mediation provides an exceptional result for the members of the

21

22         [2] Kathryn Zickuhr, *Generations and Their Gadgets*, Pew Research Center's Internet and

23 American Life Project (Feb. 3, 2011).  Available at

   http://pewinternet.org/Reports/2011/Generations-and-gadgets/Report.aspx?view=all

24         [3] Text messaging—also known as "SMS," or "Short Message Service"—allows cellular

25 telephones to send and receive short text messages, usually limited to 160 or so characters.  A text

   message call, when directed to a cell phone through the use of the telephone number assigned to

26 the device, causes the phone to ring or otherwise alert called party that a text message has been

   received.

27         [4] Amanda Lenhart, *Cell Phones and American Adults: They Make Just as Many Calls, but Text

   Less than Teens*, Pew Research Center (2010).

28

B2Mobile Class and LeadClick Auto Class, with each being able to obtain up to $100 for receiving any unsolicited text message sent by or on behalf of Defendants.  In addition to this substantial monetary relief, the Settlement also provides for industry-changing injunctive relief designed with a specific set of guidelines that ensures Defendants and their business partners will no longer transmit text messages to consumers without their express prior consent.  (*See* Settlement Agreement, attached hereto as Exhibit 1.)

On July 29, 2011, the Court gave its preliminary approval to the settlement, approved the manner and form of notice, directed the Parties to implement the notice plan, and set a date for the final approval hearing.  (Dkt. 125).  The court-approved notice plan has been successfully implemented with the notice of the Settlement reaching an estimated 80.8% of potential members of the classes, and the deadline for the submission of requests for exclusion and objections has expired.  The exceptional result for the classes obtained through the Settlement is confirmed by the fact that only two individuals requested to be excluded and only two professional objectors— each with a judicially cataloged history of filing meritless objections to class action settlements on behalf of non-class members—filed papers taking issue with the terms of the Agreement.  Putting aside the meritless contentions of these professional objectors on behalf of non-class members, the reaction of the classes has been unanimously positive.

The positive reaction is unsurprising, given that the Settlement has achieved exceptional results for the classes.  The Settlement provides each Class Member who submits a valid claim by March 12, 2012[5] with up to a $100 cash settlement payment from the combined $12.2 million B2Mobile Settlement Fund and LeadClick Settlement Fund.  On top of this significant monetary relief, the Settlement calls for groundbreaking injunctive measures, including requirements that: (1) Defendants obtain and keep records of consumers' express consent to receive text message advertisements; (2) Defendants abide by specific restrictions and guidelines in obtaining consent

---

[5] Should the Court grant final approval to the Settlement at the Final Approval Hearing the Claims Deadline will be March 12, 2012.  However, should final approval not be entered at that time the Claims Deadline is 45 days after the Court grants final approval.

(such as the location of notice on a website that a consumer will receive text messages after submitting a phone number to that website) and utilizing an automatic telephone dialing system ("ATDS"); (3) Defendants include provisions in their third party business contracts going forward that require their business partners, who either send text messages on their behalf or who provide customer phone numbers, to follow the same restrictions applicable to Defendants in obtaining consent and using an ATDS to send text messages; and (4) Class Members are given the opportunity to have their phone numbers permanently removed from Defendants' databases to ensure they will no longer receive unwanted text messages from Defendants. The monetary and injunctive components of the Settlement together provide a truly superior result for the Settlement Class.

Accordingly, Plaintiff Kramer respectfully requests that the Court grant final approval of the Agreement dismissing the Released Claims with prejudice, and awarding the agreed-upon attorneys' fees and incentive award.

## II.   HISTORY OF THE LITIGATION

On November 17, 2009, Class Representative Christopher Kramer initiated this class action in the United States District Court for the Western District Court of Washington, alleging that he received several unauthorized text message advertisements sent by B2Mobile on behalf of then Defendant Autobytel, Inc.[6] (Dkt. 1.) In April 2010, Plaintiff amended his Complaint to add Defendant LeadClick Media as an alleged beneficiary of the unauthorized text message ads at issue. (Dkt. 20.) Both complaints contained a single count claiming that the transmission of the text message ads received by Kramer violated the TCPA. Shortly thereafter, Defendant B2Mobile filed an initial motion to dismiss, or, in the alternative, transfer the case to this District from the Western District of Washington. (Dkt. 25.) Following negotiations by the Parties, Plaintiff consented to the transfer and the case was moved by stipulation to this Court. (Dkt. 36.) Once the

---

[6]   On October 22, 2010, Plaintiff voluntarily dismissed Autobytel, Inc. from this litigation pursuant to an individual settlement agreement. (Dkt. 99.) The Court dismissed with prejudice Plaintiff's individual claims against Autobytel, and dismissed without prejudice the putative class claims against Autobytel. (Dkt. 100.)

transfer was effectuated, each Defendant filed a motion to dismiss challenging both the constitutionality of the TCPA as vague when applied to text messaging as well as the sufficiency of Plaintiff's pleadings.  (Dkts. 58, 66.)  Extensive briefing followed and the United States Department of Justice intervened in the case for the purpose of opposing the constitutional challenges.  (Dkt. Nos. 71, 73 & 98.)  Ultimately, this Court denied both Defendants' motions to dismiss.  (Dkt. 106.)

Following the denial of Defendants' motions, the Parties agreed to move forward with discovery while simultaneously scheduling a mediation with Professor Eric D. Green of Resolutions, LLC to attempt to resolve the matter.  (*See* Dkt. Nos. 105, 107, & 108.)  Before the mediation, the Parties entered into an agreement to informally exchange answers to certain interrogatories, documents and other information that they agreed were needed to effectively engage in the mediation process.  (*See* Declaration of Ryan Andrews ¶¶ 4, attached hereto as Exhibit 2).  In addition, Plaintiff sat for a daylong deposition where he was questioned extensively about the case and his personal life by both Defendants' counsel.  (Andrews Decl. ¶ 4.)

In addition to acquiring relevant discovery information, the Parties exchanged extensive mediation statements advocating their respective views of the case.  (Andrews Decl. ¶ 4; Declaration of Eric D. Green ¶ 5, attached hereto as Exhibit 3.)  The Parties' mediation statements included settlement proposals that were at odds and at opposite ends of the settlement spectrum.  (Green Decl. ¶ 5.)  On March 28, 2011, Class Counsel, along with LeadClick's Counsel, B2Mobile's Counsel, corporate representatives of each Defendant, representatives of their insurers American International Specialty Line Insurance Company ("AISLC") and Lloyd's of London, and counsel for both insurers, met in San Francisco for a formal mediation with Professor Green, with Plaintiff Kramer available by telephone.  (Green Decl. ¶¶ 4, 6; Andrews Decl. ¶ 3.)  During the course of the mediation, various settlement models were explored and rejected, and all Parties were forced to compromise and move off of their original positions.  (Green Decl. ¶¶ 7, 8.)  Ultimately, after a full-day mediation with Professor Green and multiple rounds of arm's-length and noncollusive negotiations (Green Decl. ¶¶ 7, 8), the Parties reached an agreement in principle and signed a memorandum of understanding concerning the key points of their agreement.

1   (Andrews Decl. ¶ 5.)  The Parties agreed that the Settlement would be structured after similar

2   settlements that have received final approval by this Court, as well as by federal courts

3   nationwide, and would contain both a sizeable amount of monetary relief for individual class

4   members as well as detailed injunctive relief to prevent further unauthorized text message

5   transmissions.  (Andrews Decl. ¶ 5.)  It was not until all of the relief was established for the

6   classes that the Parties began to engage in any discussions about attorneys' fees or incentive

7   awards.  (Green Decl. ¶ 9-10; Andrews Decl. ¶ 5.)

8          In the months following the mediation, the Parties continued to negotiate the details of the

9   Settlement Agreement, solicited notice proposals from multiple settlement administrators to find

10  the most cost-effective way to provide the best notice practicable, finalized the notice documents,

11  and moved for preliminary approval shortly after signing the final Settlement.  (Andrews Decl. ¶

12  6.)  After holding a hearing on Plaintiff's motion, the Court granted preliminary approval finding

13  that the Settlement was fair and reasonable and directing the Parties to initiate the notice plan.

14  (Dkt. 125.)  Class Counsel thereafter worked with the settlement administrator to ensure that

15  notice was properly distributed and fielded inquires from potential class members regarding

16  settlement details and aiding class members in the claims process.  (Andrews Decl. ¶ 7.)

17  **III.    KEY TERMS OF THE SETTLEMENT**

18         The terms of the settlement preliminarily approved by the Court are set forth in the

19  Agreement attached hereto as Exhibit 1 and are briefly summarized as follows:

20         **A.     Class Definition:**  The Court, in its July 29, 2011 Preliminary Approval Order

21  (Dkt. 125, ¶ 5), certified two classes, the "B2Mobile Class" and the "LeadClick Auto Class."  The

22  classes are defined as follows:

23         **"B2Mobile Class"** consisting of all Persons in the United States and its territories

24         who, from January 1, 2008 until the date of preliminary approval, received a text
            message from Short Code 77893 or a text message containing a B2Mobile

25         Website that was transmitted by or on behalf of B2Mobile and was sent without
            such Person's prior express consent.

26

27         **"LeadClick Auto Class"** consisting of all persons in the United States and its
            territories who, from January 1, 2008 until the date of preliminary approval,

28         received an automobile-related text message from Short Code 77893 or an

automobile-related text message containing a B2Mobile Website that was transmitted by or on behalf of B2Mobile and was sent without such Person's prior express consent.

**B.     Cash Payments to Class Members:**  The Settlement provides for a cash payment of up to $100 to each class member who submits an approved claim by the Claims Deadline, which is presently March 12, 2012.  These payments will be made from two separate settlement funds totaling $12,200,000 created by the Settlement:  the $10 million LeadClick Settlement Fund and the $2.2 million B2Mobile Settlement Fund.[7]  In the event that the total amount required to pay $100 for each claim would exceed the amount in the LeadClick or B2Mobile Settlement Funds after payment of LeadClick's and B2Mobile's portions of the Notice, Settlement Administration Expenses, the Fee Award, and the incentive award to the Class Representative, each LeadClick Auto or B2Mobile Class Member shall receive a *pro rata* share of the amount remaining in the respective settlement fund.

In recognition of the number of class members and the limited amount of funds available, should either a LeadClick Auto or B2Mobile Class Member's *pro rata* share be calculated to be less than $5, then all payments that would have been distributed to members of the classes shall be proportionally distributed to the *cy pres* recipients selected by the members of the classes on their claim forms.  (Ex. 1, §§ 2.3-2.4.)  Further, any monies remaining in the B2Mobile Settlement Fund after all claims and expenses are paid, inclusive of uncashed checks, shall be distributed to the *cy pres* recipients.  (Ex. 1, § 2.4(d).)

**C.     Injunctive Relief:**  In addition to monetary relief, the Settlement Agreement also provides for comprehensive injunctive relief designed to alter Defendants' business practices, influence others in the industry to change their ways of doing business, and ensure that explicit prior express consent is obtained from consumers before they receive any text message advertisements by or on behalf of Defendants.  (Ex. 1 § 2.1.)  Specifically, should the Court grant

---

[7] The amounts of the respective settlement funds equal the total available limits of each Defendant's insurance policy and were heavily influenced by the financial condition of the Defendants.  Defendants provided confirmatory discovery that has verified the veracity of these representations.  (Andrews Decl. ¶ 7; Ex. 1, § 10.1.)

final approval, Defendants will stipulate to the entry of an injunction requiring that the following practices be instituted:

      **1.**    **Obtaining Prior Express Consent**.  Defendants have agreed that express consent of consumers to receive text messages will only be obtained "by oral or written means, including electronic methods," and any authorization allowing Defendants to obtain a cellular phone number from a website will include an affirmative action on the part of the consumer, such as checking a box or clicking on an "I Accept," "Submit," "Proceed," or similar button, with a disclosure that indicates plainly to the consumer that the affirmative action will result in the receipt of text messages.  This disclosure will be displayed on the same page, within a reasonable distance from the telephone number submit field, and in text of sufficient size and contrast to be clearly legible.  (Ex. 1, § 2.1.)

      **2.**    **Proof of Consent**.  Defendants must retain documented proof of all instances in which it received prior express consent from consumers to receive text messages for a period of four years after said consent is obtained by Defendants or their agents.  (*Id.*)

      **3.**    **Modification of Third-Party Agreements**.  In any third-party business contract entered into for the purpose of transmitting text messages on Defendants' behalf or for obtaining consumer cell phone numbers to transmit text messages, Defendants must include provisions that require the third party to follow the same restrictions applicable to Defendants with respect to obtaining prior express consent and using an automated telephone dialing system to transmit text messages.  (*Id.*)

      **4.**    **Prohibition on Future Messages**.  Each Claim Form includes an option allowing class members the opportunity to remove their cellular phone numbers from Defendants' databases so that they will not be sent future text messages by or on behalf of Defendants.  (Ex. 1, § 2.2.)

    **D.**    *Cy Pres***:**  The Settlement provides for an innovative *cy pres* distribution that allows members of the B2Mobile Class and the LeadClick Auto Class to play a direct role in selecting *cy pres* recipients should either a *pro rata* distribution result in any class member receiving less than $5 or if there is any money remaining in the B2Mobile Settlement Fund.  On each Claim Form,

1    claimants are asked to select their preferred organization from six possible charitable or non-profit

2    entities:  Habitat for Humanity, Big Brother Big Sister, American Red Cross, National Center for

3    Missing and Exploited children, Fisher House Foundation, and Operation HOPE.  These

4    organizations were specifically selected to align with the areas promoted by the text messages

5    advertisements sent to the class.  Each recipient will receive a share of any *cy pres* distribution,

6    described below, proportionate to Class Members' selections.  (Ex. 1, § 1.14.)

7         In addition, any monies remaining in the B2Mobile Settlement Fund after all claims, fees,

8    and expenses are paid, will also be distributed to the *cy pres* recipients on a proportional basis.

9         **E.       Payment of Notice and Administrative Expenses:**  Defendants have paid and will

10   continue to pay out of each respective settlement fund the cost of sending the Court-approved

11   notice, the costs of administration of the settlement and the processing of claims, and all other

12   services performed by the settlement administrator as required by the Settlement Agreement.  (Ex.

13   1, § 1.48.)  Presently, these costs are $965,874.46, with additional expected costs of $281,058.54.

14   (Declaration of Tore Hodne (Rust Consulting, Inc.) ¶ 17, attached hereto as Exhibit 4.)

15        **F.       Compensation for the Class Representative:**  In addition to any benefit under the

16   Settlement, in recognition of his efforts on behalf of the class, and subject to the approval of the

17   Court, Defendants have agreed to pay Class Representative Christopher Kramer an incentive

18   award out of the settlement funds for appropriate compensation for his time and effort serving as

19   the class representative in this litigation in the amount of $10,000.  (Ex. 1, §§ 8.4-8.6.)

20        **G.       Payment of Attorneys' Fees and Expenses:**  Subject to the approval of the Court,

21   Defendants have agreed to pay Class Counsel from the settlement funds $3,050,000 for both

22   attorneys' fees and for the reimbursement of costs.  The basis for Class Counsel's fee request is

23   fully set forth in the Motion for Award of Attorneys' Fees, Expenses, and Incentive Award filed

24   on December 16, 2011.  (Dkt. 127.)

25        **H.       Release of Claims:**  Should the Court award final approval to the Settlement,

26   Plaintiff and each member of the B2Mobile Class and LeadClick Auto Class who has not timely

27   filed a request to be excluded will release and forever discharge the Defendants, and each of their

28   related affiliates and entities, from any and all manner of claims, whether known or unknown,

1   arising out of or relating to LeadClick or B2Mobile's involvement in the transmission of any

2   unauthorized text messages from Short Code 77893 or any text message containing a B2Mobile

3   Website.  (*See* Ex. 1, §§ 3, 1.12, & 1.42-1.45 for the full release.)

4   **IV.    THE CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23**

5           Before final approval of a class action can issue, notice of the settlement must be provided

6   to the class.  Fed. R. Civ. P. 23(e)(1).  Here, the Court-approved notice plan was executed to the

7   standards of Due Process and Rule 23, which require that the class receive "the best notice

8   practicable under the circumstances, including individual notice to all members who can be

9   identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); (Declaration of Shannon R.

10  Wheatman (Kinsella Media, LLC) ¶¶ 5, 27-30, attached hereto as Exhibit 5).  Actual notice,

11  however, is not required.  *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).  Notice to the class

12  must be "reasonably calculated under all the circumstances, to apprise interested parties of the

13  pendency of the action and afford them an opportunity to present their objections."  *Mullane v.*

14  *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (citations omitted).

15          Not only must notice of a class action settlement be properly disseminated to the class, its

16  content must also "generally describe[] the terms of the settlement in sufficient detail to alert those

17  with adverse viewpoints to investigate and come forward to be heard."  *Churchill Village, LLC v.*

18  *Gen Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).  Under Rule 23(c)(2)(B), the notice directed to the

19  class must clearly, and in concise, plain, easily understood language state:  (a) the nature of the

20  action; (b) the definition of the class certified; (c) the class claims, issues, or defense; (d) that a

21  class member may enter an appearance through an attorney if he or she desires; (e) that the court

22  will exclude any member of the class upon request; (f) the method and time to request exclusion;

23  and (g) that the judgment will be binding on class members.  The Parties have strictly adhered to

24  these requirements in this case.

25          The Order granting preliminary approval of the Settlement specifically found that the form

26  and methods set forth in the Settlement Agreement's Notice Plan "is the best notice practicable

27  under the circumstances," that the "Notice complies fully with the requirements of the Federal

28  Rules of Civil Procedure," and that the "Notice constitutes valid, due and sufficient notice to all

persons entitled thereto, and meets the requirements of Due Process." (Dkt. 125, ¶ 8.) The Parties have fully complied with the approved notice plan and the Court should affirm its finding at preliminary approval that the forms and methods of notice satisfied the requirements of Due Process and Rule 23.

Prior to finalizing the Settlement, the Parties solicited notice proposals from four respected class action settlement administrators and selected Kinsella Media / Rust Consulting ("Kinsella"), an administrator with extensive experience in providing proper notice. (Andrews Decl. ¶ 6; Wheatman Decl. ¶ 2; Hodne Decl. ¶¶ 5-6; Dkt. 121-3, ¶¶ 2-7.) The Parties selection of Kinsella to implement its proposed Notice Plan and perform settlement administration activities was guided by considering both its estimates of the number class members its plan would notify, along with a cost estimate that would not unduly exhaust the entirety of the settlement funds in notifying the members of the classes. (Andrews Decl. ¶ 6.) Because the only information about the members of the B2Mobile Class and the LeadClick Auto Class were the cell phone numbers to which the text messages at issue were sent, and all legitimate methods of providing direct notice would have completely exhausted both settlement funds, Kinsella developed a wide-reaching five-part notice plan which was specifically designed to reach as many members of the class as possible through various methods. (Wheatman Decl. ¶¶ 4-15; Dkt. 121-3 ¶¶ 8-14.)

In the initial phase of the Notice Plan, Kinsella caused the Court-approved summary notice to appear in *Parade*, the highest circulating magazine in the world with inserts in 500 daily newspapers across the U.S., as well as in national consumer magazines *Cosmopolitan*, *ESPN The Magazine*, *Maxim*, *Newsweek*, and *People.* (Wheatman Decl. ¶¶ 8-9.) For part 2 of the Notice Plan, Kinsella created Internet banner advertising that appeared on websites across the 24/7 Real Media Network, the Adconion Network, and the Microsoft Media Network from August 22, 2011 to September 30, 2011.[8] (Wheatman Decl. ¶¶ 10.) Internet banner ads providing notice of

---

[8] A detailed description of the 24/7 Real Media Network, the Adconion Network, and the Microsoft Media Network, as well as the website comprising those networks, is contained in exhibit B to the Declaration of Shannon Wheatman submitted in support of Preliminary Approval. (Dkt. 121-3.)

resulted in 286,113,891 gross impressions.  (Wheatman Decl. ¶ 10.)  Because the consumers comprising the classes are all mobile phone users, Kinsella placed additional mobile banner advertisements promoting the Settlement on myriad mobile websites belonging to the JumpTap Mobile Network, which resulted in 11,556,934 additional gross impressions.  (Wheatman Decl. ¶ 11.)  Finally, on August 12, 2011, a press release was distributed on the PR Newswire network of 6,000 media outlets and 5,500 websites.  (Wheatman Decl. ¶ 14.)  Sixty-four independent news stories about the Settlement resulted.  (Wheatman Decl. ¶ 14.)

Lastly, on July 28, 2011, in compliance with the Class Action Fairness Act, 28 U.S.C. §1715(b), Kinsella mailed a letter, prepared by Defendants' counsel, enclosing the requisite court documents to the U.S. Attorney General and the Attorneys General of each state and U.S. territory giving notice of the Settlement.  (Hodne Decl. ¶ 7.)   The United States Department of Justice, as an intervenor, also received real-time notice of the Settlement and all proceedings in this case via CM/ECF.

The Court-approved summary notice, CAFA Notice, and the internet and mobile banner advertisements all provided a link to the neutral website www.TextAdClass.com, which went live on August 10, 2011.  (Hodne Decl. ¶¶ 9-10.)  The website provides the traditional "long form" notice of the Settlement, and allows for members of the classes to file Claim Forms online and obtain additional information and documents about the Settlement, including a .pdf file of the Long Form Notice, Court documents, Frequently Asked Questions, and the fee application.  (Wheatman Decl. ¶ 15.)  All told, the Notice Plan achieved its projected saturation and reached approximately 80.8% of Mobile Phone & Internet Users, a total of 125,117,000 potential members of the B2Mobile Class and LeadClick Auto Class, an average of 3.0 times each.  (Wheatman Decl. ¶ 4.)

In addition to implementing the methods of notice that resulted in reaching the greatest number of members of the B2Mobile Class and LeadClick Auto Class as practicable, the content of the notice was specifically edited by Kinsella so that it used simple, plain language text encouraging readership and comprehension.  (Wheatman Decl. ¶¶ 21-26)  The summary notice met each requirement of Rule 23(c)(2)(B) and the long-form notice provided even more detail

1   about the nature of Plaintiff's claims concerning the receipt of unauthorized text messages in

2   alleged violation of the TCPA, along with class members' rights to participate in or object to the

3   settlement.  (Wheatman Decl. ¶¶ 21-26.)  Moreover, contrary to the assertions made by objecting

4   non-class member Mr. Cope, both the summary publication notice and "long form" website notice

5   clearly informed members of the classes that settlement payments would be "*up to $100*," that

6   such payments would potentially be reduced *pro rata* depending on the number of claims, and that

7   payments would be made to charities selected by members of the classes on the Claim Form.

8   (Wheatman Decl. ¶ 26.)

9       In sum, notice to the class complied with the Preliminary Approval Order, Rule 23, and

10  Due Process, plainly satisfying the standard of the "best practicable" notice under the

11  circumstances.

12  **V.      THE SETTLEMENT WARRANTS FINAL APPROVAL**

13      The law favors the compromise and settlement of class action suits.  *See, e.g., Byrd v. Civil

14  Serv. Comm'n*, 459 U.S. 1217 (1983); *Churchill Village*, 361 F.3d at 576; *Class Plaintiffs v. City

15  of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  Under Federal Rule of Civil Procedure 23(e),

16  "[t]he court must approve any settlement, voluntary dismissal, or compromise of the claims, issues

17  or defenses of a certified class" and such approval may occur "only after a hearing and on finding

18  that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate."  Fed. R.

19  Civ. P. 23; *In re OmniVision Tech. Inc.*, 559 F. Supp. 2d 1036, 1040 (N.D. Cal. 2008).  A

20  settlement is fair, reasonable, and adequate where, as here, "the interests of the class are better

21  served by the settlement than by further litigation."  *Garner v. State Farm Mut. Auto. Ins. Co.*, No.

22  CV-08-1365-CW, 2010 WL 1687832, *8 (N.D. Cal. Apr. 22, 2010) (quoting MANUAL FOR

23  COMPLEX LITIG. (FOURTH) § 21.61 (2004)).  The decision to approve or reject a settlement [under

24  Rule 23(e)] is committed to the sound discretion of the trial Judge…"  *Hanlon v. Chrysler Corp.*,

25  150 F.3d 1011, 1026 (9th Cir. 1988).  In exercising such discretion, courts should give "proper

26  deference to the private consensual decision of the parties."  *Garner,* WL 1687832, at *8 (citing

27  *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of

28  stock in the product of an arms-length, non-collusive, negotiated resolution . . .").

In assessing the fairness, reasonableness and adequacy of a class action settlement, courts generally consider the following non-exhaustive list of factors:  "(1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the state of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement."  *Rodriguez*, 563 F.3d at 963 (quoting *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010)).

While the Court may consider each of the foregoing factors when considering the final approval of a class action settlement, "[i]n the Ninth Circuit, a court affords a presumption of fairness to a settlement, if:  (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  *Lewis v. Starbucks Corp.*, No. 07-cv-00490, 2008 WL 4196690, at *7 (E.D. Cal. Sept. 11, 2008) (citing *Alba Conte & Herbert B. Newberg*, NEWBERG ON CLASS ACTIONS § 11:41 (4th Ed 2002)).  As discussed herein, the Settlement was reached:  (1) after extensive, arm's-length negotiations with the assistance of a well-respected mediator; (2) after the exchange of both formal and informal discovery; and (3) by experienced counsel with extensive experience with the TCPA and class actions.  Accordingly, the Court's analysis of the factors listed below should be examined with a presumption that the Settlement Agreement is fair.

### A.    *The Strength of the Plaintiff's Case*

The first step in assessing the fairness of a class action settlement is to examine "Plaintiff's likelihood of success on the merits and the range of possible recovery."  *Garner,* 2010 WL 1687832, at *9; *see also Protective Comm. For Indep. Stockholders v. Anderson*, 390 U.S. 414, 424-25 (1968) ("Basic to [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of the litigation").  The analysis of Plaintiff's probability of success on the merits, however, is not rigid or beholden to any particular formula, and "the Court may presume that through negotiation, the Parties, counsel, and

1   mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of

2   recovery." *Garner*, 2010 WL 1687832, at *9 (citing *Rodriguez*, 563 F.3d at 965).

3           In order to obtain a successful recovery for the classes on his TCPA claim through

4   continued litigation, Plaintiff would have needed to certify both classes pursuant to Rule 23 and

5   then prove at trail that Defendants made:  (1) an unauthorized call, (2) to a cellular telephone, and

6   (3) using an ATDS.  *See* Dkt. 106; *Satterfield v. Simon & Schuster*, 569 F.3d 946, 950 (9th Cir.

7   2009) (citing 47 U.S.C. § 227(b)(1)(A)(iii)); *see also Kazemi v. Payless Shoesource, Inc.*, No. C

8   09-5142 MHP, 2010 WL 963225, at *2 (N.D. Cal. Mar. 16, 2010).  B2Mobile's Answer to the

9   Amended Complaint asserted twenty-two separate affirmative defenses, while LeadClick asserted

10  eighteen affirmative defenses.  (Dkts. 109, 110.)  The affirmative defenses included that Plaintiff

11  consented to receive the text messages, that the text messages were not transmitted with an ATDS,

12  that a text message is not a "call" under the TCPA, that consumers must be charged for the text

13  messages for the TCPA to apply, and that the TCPA is unconstitutional as violative of the First

14  Amendment and Due Process Clause.  (*Id.*)

15          Class Counsel are confident in the strength of Plaintiff's claims, but they are also cognizant

16  of the risks inherent in proceeding without this Settlement.  (Andrews Decl. ¶ 10.)  First, although

17  TCPA class actions are routinely certified by courts nationwide, *see*, *e.g.*, *Kavu, Inc. v. Omnipak*

18  *Corp.*, 246 F.R.D. 642, 646-47 (W.D. Wash. 2007); *Paldo Sign & Display Co. v. Topsail*

19  *Sportswear, Inc.*, No. 08 C 5959, 2010 WL 4931001, at *2 (N.D. Ill. Nov. 29, 2010); *Critchfield*

20  *Physical Therapy v. Taranto Group, Inc.*, 263 P.3d 767 (Kan. 2011), if Plaintiff failed to obtain

21  class certification the case would be effectively over.  In addition, while many of Defendants'

22  affirmative defenses have been rejected by this Court and numerous others, *see Satterfield*, 569

23  F.3d at 946; *Kazemi v. Payless Shoesource, Inc.*, No. C 09-5142, 2010 WL 963225, at *3 (N.D.

24  Cal. March 16, 2010); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 10009-

25  1010 (N.D. Ill. 2010); *Abbas v Selling Source, LLC*, No. 09 CV 3413, 2009 WL 4884471, at *1

26  (N.D. Ill. Dec. 14, 2009); *Gutierrez v. Barclays Group*, No. 10-cv-1012 DMS (BGS), 2011 WL

27  579238 (S.D Cal. Feb. 9, 2011), only one such defense need gain traction with a jury, the Court, or

28  the Ninth Circuit to defeat Plaintiff's claims.  Further, Plaintiff would need to prevail in proving

the equipment that B2Mobile utilized to transmit the text messages at issue had the requisite "capacity" to fall within the statutory definition of an ATDS, an issue upon which there is little settled case law.

Ultimately, Defendants' financial condition has made it highly unlikely that Plaintiff would have been able to recover more than the limits of each Defendants' insurance policy even if Plaintiff were to prevail on each of the issues detailed above.  Given the inherent risk of continued litigation, the assuredly vigorous defense that would be presented, the number of affirmative defenses presented, and Defendants' financial condition, the strength of Plaintiff's case could not justify rejection of this Settlement.  Accordingly, the strength of Plaintiff's case favors approval of the Settlement.

### B.   *The Risk of Continued Litigation*

The second "fairness" factor this Court may consider is "the risk of continued litigation balanced against the certainty and immediacy of recovery from the Settlement." *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)).  "The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005); *see also Garner*, 2010 WL 1687832, *10 ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class").  Further, this factor favors the approval of a settlement where, as here, significant procedural hurdles remain, including anticipated summary judgment motions, class certification, *Daubert* motions, and additional appeals.  *Garner*, 2010 WL 1687832, at *10 (citing *Rodriguez*, 563 F.3d at 966).

Here, it is certain that the expense, duration and complexity of the protracted litigation that would result in the absence of settlement would be substantial.  Significant costs would be expended by both Parties should this matter proceed to trial, including expenses for expert witnesses related to the ATDS issue, and the myriad other costs that accompany the trial of a nation-wide class action.  (Andrews Decl. ¶ 10.)  Yet, the added cost and burden of continued

1   litigation would not likely procedure better results for either class, especially in light of the

2   Defendants' financial conditions and exhaustion of insurance policy limits.  It is also difficult to

3   contemplate the award of more comprehensive injunctive relief to prevent future alleged

4   violations.  As Plaintiff faced a significant challenge in proving his case on the merits, the

5   substantial and prompt relief provided to the Class under the Settlement, balanced against the

6   inherent risk of continued litigation, weighs heavily in favor of approval.

7           **C.      *The Risk of Maintaining Class Action Status***

8           The Court's July 29, 2011 Order certified a two nationwide classes for settlement purposes

9   only.  (Dkt. 125, ¶ 5.)  However, if the Court fails to grant final approval of the Settlement

10  Agreement for any reason, the certification of the class will automatically become void.  (*Id.* ¶ 7.)

11  Although Plaintiff and Class Counsel believe they would be successful in obtaining certification of

12  an adversarial class absent the Settlement, Defendants have made it clear that in its absence they

13  would vigorously oppose adversarial certification.  Further, even if Plaintiff were successful in a

14  motion for class certification absent the Settlement, Defendants could move for decertification of

15  the class before or during trial and likely would challenge certification on appeal.  Fed. R. Civ. P.

16  23(c)(1)(C).  Accordingly, this factor weighs in favor of approving the Settlement Agreement

17  because if at any point the Class failed to become certified or if certification was reversed, the

18  Class would get nothing.

19          **D.      *The Amount Offered in the Settlement is Substantial***

20          The amount of recovery offered by Defendants also strongly supports approval.  The

21  reasonableness of the amount offered can be determined by comparing it to the maximum

22  potential recovery if Plaintiff were to ultimately succeed at trial.  *See OmniVision,* 559 F. Supp. 2d

23  at 1042 (finding a certain recovery of 6% of the potential recovery after accounting for attorneys'

24  fees and costs to be reasonable and favor approval of the settlement).  In fact, "[i]t is well-settled

25  that a cash settlement amounting to only a fraction of the potential recovery does not per se render

26  the settlement inadequate or unfair."  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615,

27  628 (9th Cir. 1982).  Moreover, the certainty and relative immediacy of the cash payment under

28  the Settlement agreement, when compared with the risk associated with seeking the full amount

1   but receiving nothing, further justifies the reasonableness of accepting less than the maximum

2   potential recovery.  *See OmniVision*, 559 F. Supp. 2d at 1042.

3         In this matter, if Plaintiff ultimately succeeded in proving that Defendants violated the

4   TCPA, he and the approximately 47 million class members would be statutorily entitled to $500

5   each.  47 U.S.C. § 227(b)(3).[9]  However, given the financial status of the Defendants, such a

6   recovery is infeasible.  The amount of the proposed settlement of up to $100 per class member

7   paid from a combined $12,200,000 settlement fund—the total available limits on each of

8   Defendants' insurance policies—combined with industry-changing injunctive relief provides a

9   substantial and immediate recovery for members of each class and precisely targets the allegedly

10  unlawful conduct at issue in this litigation.  Given the inherent risks of continued litigation and

11  possible non-payment discussed in detail above, the reasonableness of the immediate payment of

12  up to $100, or even a lesser *pro rata* amount, is readily apparent.  *See Lipuma,* 406 F. Supp. 2d at

13  1323 ("[I]t has been held proper to take the bird in hand instead of a prospective flock in the

14  bush").  Accordingly, this factor too favors final approval of the Settlement.

15        **E.     *The Extent of Discovery Completed and the Stage of the Litigation***

16        The next factor requires the Court to consider both the extent of the discovery conducted to

17  date and the stage of the litigation as indicators of class counsel's familiarity with the case and

18  ability to make informed decisions.  *OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re Mego Fin.*

19  *Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir. 2000)).  A compromise based on an understanding of

20  the legal and factual issues with a genuine arm's-length negotiation is "presumed fair."  *Nat'l*

21  *Rural Telecomms. Corp. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004).  Where

22  extensive discovery has occurred, it is reasonable for the district court to conclude that Class

23

24  _____

25        [9] Further, if Plaintiff was successful in demonstrating the willful violation of the TCPA, the

26  Court has the discretion to treble the available damages.  47 U.S.C. § 227(b)(3).  However,
    although treble damages are available under the TCPA, the Court need not factor their availability

27  into its consideration of the reasonableness of the negotiated amount.  *See Rodriguez*, 563 F.3d at
    965-66.

28

1   Counsel fully grasped the merits of the case prior to engaging in settlement or mediation.

2   *Rodriguez*, 563 F.3d at 967.

3          The Parties' understanding of the factual and legal issues in this case is extremely well-

4   developed.  Following the denial of Defendants' motions to dismiss the Amended Complaint, the

5   Parties exchanged both formal and informal discovery, and when Class Counsel appeared at the

6   mediation with Professor Green, they were intimately familiar with the applicable case law and

7   were in possession of sufficient discovery to intelligently negotiate the terms of the instant

8   Settlement to the ultimate benefit of each class.  (Andrews Decl. ¶ 4; Green Decl. ¶ 5.)  Further,

9   Class Counsel required and obtained confirmatory discovery from Defendants concerning the

10  information available to them about the class members, the websites promoted in the allegedly

11  offending text messages, Defendants' financial condition, and the limits of the applicable

12  insurance policies.  (Dkt. 121-1 § 10.1; Andrews Decl. ¶ 7.)   Accordingly, this factor too favors

13  approval of the Settlement.

14         **F.**        ***The Experience and Opinion of Counsel***

15         The Court may also properly consider counsel's experience and views about the adequacy

16  of the Settlement.  *Garner*, 2010 WL 1687832, at *14; *OmniVision*, 559 F. Supp. 2d at 1043.  In

17  fact, "[t]he recommendations of plaintiff's counsel should be given a presumption of

18  reasonableness." *OmniVision*, 559 F. Supp. 2d at 1043 (quoting *Boyd v. Bechtel Corp.*, 485 F.

19  Supp. 610, 622 (N.D. Cal. 1979)).  Reliance on such recommendations is premised on the fact that

20  "parties represented by competent counsel are better positioned than courts to produce a settlement

21  that fairly reflects each party's expected outcome in the litigation." *Rodriguez*, 563 F.3d at 967

22  (quoting *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)).

23         Class Counsel regularly engage in major complex litigation, and have extensive experience

24  in prosecuting consumer class action lawsuits of similar size and complexity, including numerous

25  class actions alleging violations of the TCPA.  (Andrews Decl. ¶ 8.)  Through their investigation,

26  review of discovery materials, litigation in this case and other similar matters, mediation with

27  Professor Green, and the settlement process, Class Counsel have gained an intimate understanding

28  of the law and facts at issue and believe the settlement more than exceeds the "fair, adequate, and

reasonable" standard required for the Court's approval.  (Andrews Decl. ¶ 9.)  This factor, therefore, also favors the Court's final approval of the Settlement Agreement.

### G.     *The Presence of a Governmental Participant*

The United States has intervened in this case and its Counsel at the Department of Justice have received notice of the Settlement through the CM/ECF system.  In addition, Defendants duly notified the United States Attorney General and the required Attorneys General of the respective states of the proposed Settlement, pursuant to Section 1715 of CAFA.  (Hodne Decl. ¶ 7.) "Although CAFA does not create an affirmative duty for either the state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures."  *Garner*, 2010 WL 1687832, at \*14.  As of the date of filing, no state or federal official has raised any objection to the Settlement Agreement.  (Andrews Decl. ¶ 11.)  Accordingly, this factor also favors approval.

### H.     *The Reaction of Class Members*

The final factor, the reaction of the class members to the Settlement, strongly supports a determination that the Settlement is fair, adequate and reasonable.  *Kent v. Hewlett-Packard Co.*, No. 5:09-CV-05341-JF HRL, 2011 WL 4403717, at \*2 (N.D. Cal. Sept. 20, 2011).  "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members."  *Nat'l Rural Telecomms*, 221 F.R.D. at 528-29; *see also Kent*, 2011 WL 4403717, at \*2 (finding that twenty-four exclusions (.0543%) and eight objections (.017%) out of an estimated 45,000 class members was a "positive response from the class weigh[ing] strongly in favor of approving the settlement"); *Churchill,* 361 F.3d at 577 (affirming approval of settlement where forty-five of 90,000 member class objected and 500 class members opted out).

In this case, the reaction of the members of both classes has been overwhelmingly positive, with only two individuals out of over 47 million class members requesting exclusion and only two professional objectors—each with a judicially cataloged history of filing meritless objections to class action settlements on behalf of non-class members—taking issue with the terms

of the Settlement. However, so as to remove any taint that the "objections" of the non-class members may have cast on the fairness of the Settlement, Plaintiff has fully responded to each of strained contentions in a separate filing submitted concurrently with this Motion. Accordingly, this and the other factors all favor this Court's entering final approval of the Settlement.

**I.     Given the Absence of Any Signs of Collusion, the Settlement Does Not Require Additional Scrutiny**

In addition to foregoing factors—all of which support certification here—the Ninth Circuit has instructed courts to carefully scrutinize cases that are settled without adversarial certification for possible collusion. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011). In particular, courts are to be aware of certain "warning signs" that warrant heightened scrutiny, including where the class receives no monetary distribution, where there is a "clear sailing" fee arrangement, and where unawarded attorneys' fees revert to the defendants rather than to the settlement fund for the class. *Id.* When these warning signs are present, "the Court must 'examine the negotiation process with even greater scrutiny than is ordinarily demanded.'" *In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011) (quoting *In re Bluetooth*, 654 F.3d at 947). In essence, each of these "warning signs" is designed to root out evidence of collusion or that class counsel have put their own interests ahead of the class, which "may not always be evident on the face of a settlement." *In re Bluetooth*, 654 F.3d at 947).

In this case, both the terms of the Settlement and the evidence submitted in support demonstrate a complete absence of collusion. Although the "verbal assurances" of counsel and "the mere presence of a neutral mediator" during settlement and fee negations is a non-dispositive "factor weighing in favor of a finding of non-collusiveness," *In re Bluetooth*, 654 F.3d at 948, the Parties here have submitted sworn proof detailing the steps taken in the mediation process that resulted in both the class relief and fee amount. (Green Decl. ¶¶ 4-11; Andrews Decl. ¶¶ 3-7). As set forth in Section II, *supra*, the process that resulted in the Settlement was, in the words of Professor Green, "the result of a noncollusive, fair, and arms-length negotiation by well represented parties." (Green Decl. ¶ 4.)

Moreover, the terms of the Settlement itself do not raise any of the concerns expressed by the Ninth Circuit in *In re Bluetooth*.  First, unlike *In re Bluetooth* where no monetary payments were provided under the terms of agreement, the Settlement here provides for monetary distributions to Class Members from the $12.2 million combined settlement fund, allowing Class members to submit a claim for a cash payment of up to $100.  *In re Bluetooth*, 654 F.3d at 947. Although the Settlement Agreement requires Defendants to abide by strong injunctive relief designed to prevent the allegedly unlawful conduct at issue in this litigation—which does in fact provide tangible value to the Class—Class Counsel are not seeking to increase their fee by specifically valuing the non-monetary benefits provided by the Settlement.  *See Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("[p]recisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund.").  Rather, Class Counsel seek only a percentage of the $12.2 million monetary value of the Settlement Fund.  Further, unlike the fees at issue in *In re Bluetooth*—that represented 83.2% of the total value of the settlement—the agreed-upon fees here are only 25% of the total amount of the Settlement, without factoring in the value of the prospective relief.  654 F.3d at 945.

Second, unlike the agreements in *Staton* and *In re Bluetooth*, this Settlement does not provide for payment of attorneys' fees separate and apart from funds paid to the Class.  *Staton*, 327 F.3d at 970; *In re Bluetooth*, 654 F.3d at 948-49.  Rather, Class Counsel are seeking a percentage of the fund from which the claims will be paid, and any funds not awarded in fees will first revert back to the Settlement Fund to pay claims of class members and not directly to Defendants.[10]  *See In re Bluetooth*, 654 F.3d at 949 ("a kicker arrangement reverting unpaid attorneys' fees to the defendant rather than the class amplifies the danger of collusion . . .").

---

[10] In the case of the B2Mobile Settlement Fund, should the Court not award the full amount of fees the funds would remain in that settlement fund until the Effective Date and then be available to pay the claims of B2Mobile Class Members or be directed to the *cy pres* recipients.  (Ex. 1, § 1.46.)  As for the LeadClick Settlement fund, any unawarded fees would first remain in that settlement fund and be available to pay the claims of LeadClick Auto Class Members before ultimately reverting to LeadClick's insurer.  (Ex. 1, § 1.47.)

Third, unlike *Staton*, the Settlement is not contingent on the Court awarding a specific fee to Class Counsel. Rather, the Parties have agreed to an overall Settlement Fund and have "left the division of that fund as between the class and counsel to the district court, as is usual in common fund cases." *Staton*, 327 F.3d at 971.

Finally, while there does exist a "clear sailing" provision[11] in the Parties' Settlement Agreement, the requested attorneys' fees were negotiated solely as a percentage of the overall Settlement Fund, meaning that Class Counsel's fees were inextricably linked to the value of the monetary benefit to the Class. (Green Decl. ¶ 9); *see also In re Oracle Securities Litigation*, 131 F.R.D. 688 (N.D. Cal. 1990) (noting that contingent, percentage based fees act as "a monitoring device" and "align the interests of lawyer and client. The lawyer gains only to the extent his client gains"). The fee negotiations here came only after Class relief was agreed upon by the Parties, the fee amount was not independently created or the product of "red-carpet treatment" in exchange for reduced benefits to the Class; rather, the fee agreement and incentive award were the final negotiated points of a "package deal" and were entirely based upon the benefits provided to the classes. *See In re Bluetooth*, 654 F.3d at 947-949; (Green Decl. ¶¶ 9-19); (Andrews Decl. ¶ 5.) Accordingly, the non-collusive nature of this Settlement, reached after a series of arm's length

---

[11] A "clear sailing" provision refers to a settlement term in which a defendant agrees not to challenge class counsel's fee request up to an agreed amount. The core of the Ninth Circuit's concern related to such a provision is the instance in which the requested fee is agreed upon as an independent figure separate and apart from the amount provided to the class. *In re Bluetooth*, 654 F.3d 935 at 947 ("when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"). Under those circumstances, the *In re Bluetooth* Court cautioned, "the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." [Citation omitted]. Therefore, when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding "unreasonably high" fees simply because they are uncontested." *Id*. at 948. The circumstances giving rise to the Ninth Circuit's concerns are not present in this settlement as Class Counsel's fee request is directly related to the Class relief.

1  negotiations and a contested mediation, should dispel any concern of the "warning signs" that

2  appear in some class actions but are completely absent here.

3           **J.      Similar Settlements Have Received Final Approval**

4           Finally, the fairness, reasonableness, and adequacy of the instant settlement is further

5  supported by the approval of similar class action settlements in this District, in the Northern

6  District of Illinois, and in the Southern District of Florida.  *See Satterfield v. Simon & Schuster,*

7  *Inc. et al.*, No. 06-cv-02893 CW (N.D. Cal.); *Bellows v. NCO Fin. Sys., Inc.*, 3:07-CV-01413-W-

8  AJB, 2008 WL 5458986 (S.D. Cal. Dec. 10, 2008); *Lozano v. Twentieth Century Fox Film Corp.*,

9  No. 09-CV-6344 (N.D. Ill. 2011); *Weinstein v. The Timberland Co. et al*, No. 1:06-cv-00484

10  (N.D. Ill. Dec. 18, 2008).  Accordingly, the proposed Settlement, which creates a $12.2 million

11  settlement fund where each recipient of the allegedly unauthorized text message advertisements is

12  entitled to a $100 settlement payment, is equally fair, reasonable, and adequate, and warrants

13  Court approval.

14  **VI.    CONCLUSION**

15          For the foregoing reasons, Plaintiffs respectfully ask that the Court grant final approval to

16  the Settlement Agreement, overrule any objections determined to be validly made, find that the

17  agreed-upon attorneys' fees and expenses and incentive awards are reasonable, enter the proposed

18  final approval order separately submitted herewith, and grant such further relief the Court deems

19  reasonable and just.

20

21

22  Dated: January 12, 2012                    Respectfully Submitted,

23                                             CHRISTOPHER KRAMER, individually and on
                                               behalf of classes of similarly situated individuals,
24
                                                _/s/  Ryan D. Andrews_____
25                                             One of Plaintiff's Attorneys

26

27

28

1  JAY EDELSON (*Pro Hac Vice*)
   jedelson@edelson.com
2  RYAN D. ANDREWS (*Pro Hac Vice*)
   randrews@edelson.com
3  CHRISTOPHER L. DORE (*Pro Hac Vice*)
   cdore@edelson.com
4  EDELSON MCGUIRE, LLC
   350 North LaSalle, Suite 1300
5  Chicago, IL 60654
6  Telephone: (312) 589-6370
   Facsimile: (312) 589-6378
7
   SEAN REIS (SBN 184004)
8  sreis@edelson.com
9  EDELSON MCGUIRE, LLP
   30021 Tomas Street, Suite 300
10 Rancho Santa Margarita, CA 92688
   Telephone: (949) 459-2124
11 Facsimile: (949) 459-2123

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2          The undersigned certifies that, on January 12, 2012, he caused this document to be

3   electronically filed with the Clerk of the Court using the CM/ECF system, which will send

4   notification of filing to counsel of record for each party.

5

6   Dated: January 12, 2012                                EDELSON MCGUIRE, LLC

7                                                             /s/  Ryan D. Andrews

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28